PHELPS v. JOHNSON. (No. 1498.)

(Court of Civil Appeals of Texas. Texarkana. Nov. 4, 1915. On Rehearing, Dec. 23, 1915.)

LANDLORD AND TENANT ⬤〰95—LEASES—CONSTRUCTION.

A lease contract, after providing in detail for the payment of rents, declared that, should the lessors make a sale of the land leased for agricultural purposes, then in that event the lease should immediately become void. The lease was for a term of five years. During the last year of the term the premises were sold and the tenant continued in possession. *Held*, that the word "lease," as used in the expression that "the lease should immediately become void," meant "contract of lease," and that, when the tenant entered upon the term of one year, his right to a continuation of possession for that year became vested.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 300–304; Dec. Dig. ⬤〰 95.]

Levy, J., dissenting.

Appeal from District Court, Bowie County; H. F. O'Neal, Judge.

Action by Isom Johnson against W. P. Phelps. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

Appellee, the owner of certain farm land, claims by his petition that appellant permissively used and cultivated the land during the year 1913, but without any express agreement as to what amount of rent the appellant would pay, and seeks to recover the reasonable annual rental, averred to be $1,175. Appellant answered, as a defense, that he held over, rented, and farmed the land during the year 1913 in virtue of a written lease to him by J. M. Talbot and Mrs. M. J. Haynie, former owners of the land, which provided that for the period of five years from January 1, 1909, he was to have the use and occupancy of the land at the annual rental of $350, and that amount, for which only he was liable,

he has tendered to appellee before suit, and now tenders into court as rent for the year 1913. The jury made the special finding of $825 as reasonable rental value of the farm for 1913, and the judgment was entered accordingly in favor of appellee.

The evidence showed that on December 1, 1908, J. M. Talbot and Mrs. M. J. Haynie, joint owners of the land, leased the same by written lease to the appellee "for the term or period of five years beginning on the 1st day of January, 1909, and ending on the 31st day of December, 1913," at the rental price of $350 for each year, payable October 15th each year; the lease containing the provision that:

"It is, however, further agreed by all parties hereto that, should the parties of the first part make a sale of the land herein leased, then and in that event this lease is to immediately become void."

Under this lease appellant entered into possession of the premises and cultivated them and paid the agreed rental each year of 1909, 1910, 1911, and 1912. On August 29, 1912, Mrs. Haynie died, leaving a will by which she devised her interest in the property to J. M. Talbot, and the will was probated in the year 1912. After the will was probated and in December, 1912, Mr. Talbot was desirous of selling the property leased and other lands. Appellant, according to the evidence, was informed by A. G. Crump about the 1st of January, 1913, that he wished to buy the place from Mr. Talbot if appellant was not going to buy it. Appellant was given the first chance by Mr. Talbot to buy the land, but he was unwilling to pay the price asked. In the latter part of January, 1913, A. G. Crump and C. C. Crump contracted with Mr. Talbot to purchase the land, and, according to their evidence, they verbally notified appellant that they had contracted to buy it, and that, if he remained in possession of the place he would have to pay the customary rent for the year, and that appellant at the time insisted that he was entitled to keep and work the place under his lease of $350 per year; Mr. Crump insisting that the lease was terminated by the sale. Appellant, though, denies that the Crumps notified him of the sale at the time, and that anything was said in reference to the lease contract. On February 14, 1913, Mr. Talbot executed and delivered a deed to A. G. and C. C. Crump conveying the premises. After the delivery of the deed, and on February 24, 1913, C. C. Crump wrote to appellant, and he received the same day, the following:

"Dear Sir: We have finally closed our deal with Judge Talbot for the farm north of Hooks, and in the contract which we got with the place the terms of the contract closes the lease which you had with him. We presume you will want to make some kind of a deal to use the place this year, and would like to have an offer from you on the rent for the year."

And on February 27, 1913, C. C. Crump wrote and appellant received the following:

---

"Dear Sir: In regard to the rent of the place this year would say we are anxious for you to keep the place for this year, and will make you a much better deal than we would with any one else or than we would with you if you had not already made arrangements to farm it. In regard to the Bloxham claim will say that I would think his claim will end when the title passed from her and your contract lapsed. One of us will be down soon, and we can close up the matter of rent for this year in some way that will be perfectly fair and satisfactory to us both."

It does not appear that appellant answered the letters. Appellant was in possession of the land on January 1, 1913, and had been continuously in such possession since January 1, 1909, and at the date of the letters, and was preparing to farm the land for 1913. And it appears that in February and March, 1913, appellant had commenced farming the land. It appears as a fact that appellant and the Crumps did not come together and make a new rental contract for 1913, and did not have any express agreement as to the amount of rent to be paid for 1913. Appellant stated to the Crumps that he was going to stay on the land and work it during the year 1913 under his written lease, insisting that it was valid and not canceled, and the Crumps insisting that the lease was nullified, and that a new contract should be made. It appears as a fact that on April 18, 1913, the Crumps made a bona fide sale of the land by deed to appellee. And it appears as a fact the appellee immediately upon his purchase insisted to appellant that he must pay the usual third and fourth of the crop raised as rent for the year, and that appellant did not agree thereto, insisting that he was to pay only $350, and no more, as provided by his written lease of December 1, 1908. Appellant, however, denies that such insistence was made by appellee, and testifies that nothing was said about third and fourth rents until September. And it was admitted by the parties as a fact that there was no express contract for amount of rent for 1913 between appellant and appellee, but that appellant just stayed on the place and cultivated it after appellee purchased it.

J. B. Manning and O. B. Pirkey, both of New Boston, and J. S. Crumpton, of Texarkana, for appellant. Mahaffey & Keeney, of Texarkana, for appellee.

LEVY, J. (after stating the facts as above). The court refused the appellant's requested peremptory instruction to find for the plaintiff the sum of $350 and for defendant for costs, and peremptorily instructed the jury to find for plaintiff the reasonable cash rental value of the premises for the year 1913. The action of the court is made the basis of complaint by assignments of error numbered 2, 6, and 9, which may be here considered together as presenting the sole controversy, under the pleading and undisputed evidence, of whether appellant was liable to pay appellee for rent for the year 1913 the reasonable rental value of the farm or the fixed sum of $350. The facts are without dispute that appellee is the owner of the land, and that appellant used and cultivated it during the year 1913, and that there was no express contract between the appellant and the appellee or his immediate vendors, the Crumps, as to the amount of rent that appellant should pay for the use and cultivation of the place. And these facts would, it is not doubted, entitle the appellee to recover the reasonable rental value of the premises, as charged by the court, unless it should further be said from the evidence that the lease of December 1, 1908, was a subsisting contract in appellant's favor, or that there was an implied contract of extension or holding over under the written lease, having the legal effect to make appellant liable only for the fixed sum of $350 as rent. The lease of December 1, 1908, pleaded by appellant and in accordance with the terms of which he claims to be holding the premises for cultivation contains the stipulation that:

"It is, however, further agreed by all parties hereto that should the parties of the first part make a sale of the land herein leased, then and in that event this lease is to immediately become void."

The language of the parties expresses the assent of each of them that upon the happening of the sale the lease is to "immediately become void." And by the language of the parties it is thought there is no room to doubt that each party to the lease meant and intended that a sale of the land could be made at any time during the life of the lease, and that such sale of the land when happening was to terminate the lease ipso facto, and it was to expire at once. Therefore it is thought that the stipulation could not properly be given the legal effect of a mere option to declare the lease void and not effective until both parties agreed to exercise the option, as insisted by appellant, but that it is in the nature of a conditional limitation upon the right of appellant to remain on the premises after a sale had been consummated. Baxter v. City of Providence (R. I.) 40 Atl. 423 ; Thomason & Son v. Oates, 46 Tex. Civ. App. 383, 103 S. W. 1114. And the fact that the land was farm land, ordinarily used and cultivated by the year, would not legally operate to fix and grant the right of appellant to remain on the premises after the sale up to and until the end of the year, as insisted by appellant, for that the parties by their solemn agreement expressly indicated an intention otherwise to put an end to the tenancy and themselves fixed the time limit that it was to "immediately become void" when the lessors "make a sale of the land herein leased." The continuance of the right to remain after sale until the end of the year would be entirely inconsistent with the agreement of the parties that the relation of landlord and tenant should cease sooner. The parties to the lease were exercising their legal privilege to contract as they wished, and any hardship in such terms of contract re-

sults solely from the free will and judgment of the parties. The courts are not at liberty to make a contract for the parties or change the valid agreements of parties when the language and intention do not admit of and forbid a modification. After the date of sale by lessors the legal result is that the appellant was not longer bound to comply with the terms of the lease, and the lessors were not thereafter bound, each party being legally free of the agreement, and it was unenforceable against either of them. And appearing as a fact, as it does, that the lessor, Talbot, made a bona fide sale by deed of the land on February 14, 1913, and to appellants' knowledge at the time, the appellant's right, according to his own agreement, to remain and cultivate the land, expired, and he could predicate no right, as a defense to appellee's suit, on the terms of the lease as such to remain there and pay only $350 for rent. Failing in fact and in law to sustain his defense of a formal enforceable lease in writing, the appellant's defense must be further determined by whether or not facts pertaining to the conduct of appellant and of appellee and his vendors, the Crumps, towards each other respecting appellant's occupancy after the termination of the written lease by sale has the legal result of an implied contract of extension or continuance of the tenancy upon the same terms of rent as those by which the parties to the lease had bound themselves in the original instrument. According to the undisputed facts, the Crumps gave notice to appellant in February and the early part of March, 1913, of their ownership of the land, and insisted that the written lease was vacated by the sale. And in their letter written in February to appellant the Crumps insisted that appellant make an offer and agreement of the amount of rent that should be paid for the year. And in March the appellee made statement to appellant that he was insisting upon rent of one-third and one-fourth of the crops raised. And it appears as a fact without dispute that appellant did not agree with the Crumps to make a new rental contract upon their insistence to do so, but met the proposal of the Crumps with the continued occupation of the land under the claim and insistence that the written lease was valid and subsisting and would hold the premises to him under its terms. It appears as a fact that the Crumps insisted to appellant that the lease was vacated by its terms by the sale, and was not to be continued, and the Crumps did not agree nor assent to appellant's cultivation of the land under the terms of the lease. And it appears as an admitted fact that:

"There was no contract between the plaintiff and the defendant about any rent, he [defendant] just stayed on the place after plaintiff bought it, and cultivated it."

Insisting, as the Crumps did in February and early in March, at the incipiency and well after the hold-over by appellant, that the old lease had expired, and that new terms of rent should be made, and insisting in March, as appellee did, that he should be paid a different rent, and insisting, as appellant did, in reply to these demands, that the written lease was subsisting and enforceable in his favor, and refusing to make a new agreement, there affirmatively appears from the facts a want of mutuality between the parties respecting the terms of rent that should govern the continued occupation and use of the place by appellant. The situation was, in fact, a contest and disagreement respecting the amount of rent to be paid; each party insisting upon his claim and demand. In these facts there is not laid, it is thought, the foundation for an implied contract to continue the relation of landlord and tenant according to the terms of rent specified in the written lease. The want of assent or acquiescence on the part of appellee and his immediate vendors affirmatively appearing, as it does, to the hold-over or continuance of the occupation by appellant under same terms of rent provided in the written lease, the court could not presume or imply assent on their part and create a term of agreement shown, in fact, not to have been made from the conduct of the parties. Ives v. Williams, 50 Mich. 100, 15 N. W. 33. It is quite elementary that contracts, both express and implied in fact, are based on consent, and that there is no legal contract without the consent of the parties. The mere fact that a tenant holds over the premises after the lease has expired does not raise a conclusive presumption that he holds under the terms of the expired contract. This presumption is merely one of fact, and may be rebutted by proof of a contrary situation. Puckett v. Scott, 45 Tex. Civ. App. 392, 100 S. W. 969. And, under the evidence, if appellant in February, upon demand of the Crumps for a new rental contract, had vacated the premises, the Crumps could have predicated no legal right to hold appellant liable on the terms of the lease for his refusing to longer take the premises for the year 1913. It is because there was no contract between the parties. And likewise appellee's remedy for the occupancy, in the facts, by appellant, was not upon contract, but on a quantum meruit account, as he sues for the beneficial use which appellant had of the land. An entirely different case would be, however, had the facts only shown, for illustration, that the appellant continued the occupancy after expiration of the lease and at the expiration of the lease had offered to continue the occupancy upon the same specified terms of the lease, and the Crumps and appellee without reply permitted appellant to continue to occupy the place. In these facts, had they been the facts, there is laid the foundation for an implied contract, as the conduct of the Crumps and appellee was, in law, a virtual assent to the terms prescribed by appellant. Therefore it is

thought that the facts of the instant case have the legal result that appellant was using and cultivating the land independent of any contract fixing the amount of rent he should pay, and appellee could sue, as he did, on a quantum meruit account for the beneficial use which appellant had of the land. 2 Page on Contracts (Ed. 1905) § 846.

By the first assignment appellant complains that the court erred in not sustaining a general demurrer to plaintiff's petition. It is believed that the petition declares upon a valid cause of action within the jurisdiction of the court to try.

By the third assignment of error complaint is made of the refusal of the court to permit the evidence of the witness Talbot respecting an executory contract for the sale of the land with C. C. Crump on January 20, 1913, and that after the execution of the contract there was appended thereto a provision to the effect that the sale of the land should be made subject to the lease of appellant. It is concluded that the court committed no error prejudicial to the appellant, and the assignment for that reason should be overruled. It appeared indisputably that this executory contract was superseded by the deed of Mr. Talbot to A. G. and C. C. Crump on February 14, 1913. This deed in legal contemplation constituted the final contract for the sale of the land. The deed contained no reference to the lease of the land. And appellant was not a party to the extension of the life of the lease, and does not appear to have known and consented at the time to the change. The original lease providing that it should be inoperative on a sale, appellant was a necessary party to a modification or change thereafter; and, unless he agreed or consented thereto, any change, extension, or modification of the original would not be binding on him or affect his legal rights in the lease.

The fourth assignment complains of the refusal of the court to permit the appellant to prove by the witness Bloxham to the effect, as stated in the brief, that he had bought Mrs. Haynie's interest in the rents coming to her under the written lease for the full term of five years, and had received the rents for 1911 and 1912, and expected same for the year 1913, and that about May or June, 1913, he sold the lease to A. G. Crump for $175 cash. Appellee objected to the evidence on the ground that it was irrelevant and because Bloxham was making no claim upon appellant at this time for rents. It is not believed the ruling constitutes reversible error. Providing, as the lease did, that it was to become void on a sale of the land, Bloxham would be held to have taken the interest of Mrs. Haynie subject to a termination of the lease on the happening of the sale. His rights in the lease would be no greater than Mrs. Haynie could convey. Consequently Bloxham's acquisition of Mrs. Haynie's interest was, as against appellant, in the nature of speculation or

chance as to the duration of the lease. The appellant, the lessee, could not be compelled by a new owner to hold the place against his agreement. And the termination of the lease by its own terms on a sale terminated for all purposes the relation of landlord and tenant, and the appellant was not thereafter liable on the lease contract for rent to Bloxham or his assignee. Bloxham was entirely dependent on his lease contract for his rights. If Bloxham had a remedy at all after the termination of the lease for the rent of 1913 paid to Mrs. Haynie, it was not against appellant, but against Mrs. Haynie or her estate in the nature of a debt for money had and received.

The further contention of appellant is not thought tenable, that after the transfer of her interest in the lease Mrs. Haynie's interest in the land ceased to the extent of the life of the lease, and that neither she nor her devisee could forfeit the lease by a sale of the land during the five-year life of the lease.

It is thought that what has been discussed above sufficiently decides that the remaining assignments of error, numbered 5, 7, 8, 10, 11, and 12, should be overruled, as not affording ground for reversal, and they are accordingly overruled.

Affirmed.

## On Rehearing.

HODGES, J. On further consideration a majority of this court are of the opinion that this case was erroneously disposed of. We fully concur in the facts found and stated in the opinion of Justice Levy affirming the judgment appealed from; we also agree in the main to the general legal propositions which he announces in the course of his discussion; but we now think that a different construction should have been given to the contract between the appellant, Phelps, and his lessors. That contract is as follows:

"The State of Texas, County of Dallas.

"This memorandum witnesseth the following contract this day entered into by and between J. M. Talbot and Mrs. M. F. Haynie, herein called parties of the first part, and W. P. Phelps, herein called party of the second part, all of said parties being residents of Bowie county, Texas, except J. M. Talbot, whose residence is Dallas county, Texas:

"First. The parties of the first part, in consideration of the promises and agreements of the party of the second part hereinafter stated, do by these presents lease and let unto the party of the second part, for the term or period of five (5) years, beginning on the 1st day of January, A. D. 1909, and ending on the 31st day of December, A. D. 1913, the following described tract or parcel of land, situated in Bowie county, Texas, and being what is known as the 'Talbot farm,' containing about one hundred and thirty (130) acres of tillable land in Red river bottom, and about thirty-five (35) acres on the hills; it being intended hereby to lease unto the said party of the second part for the term aforesaid all of the land owned by the parties of the first part in what is known as the Chas. Lewis H. R. Survey situated in said

county, and lying about five (5) miles north of the town of Hooks, in said county.

"Second. In consideration of the aforesaid lease made to him by the parties of the first part, the party of the second part does hereby agree and bind himself to pay as rent for said land the sum of three hundred and fifty ($350.-00) dollars for each and every year of said lease, to be paid as follows: Three hundred and fifty dollars on the 15th day of October, 1909. Three hundred and fifty dollars on the 15th day of October, 1910. Three hundred and fifty dollars on the 15th day of October, 1911. Three hundred and fifty dollars on the 15th day of October, 1912. Three hundred and fifty dollars on the 15th day of October, 1913. One-half of such payments to be paid to Mrs. M. F. Haynie at New Boston, Texas, and the other one-half to be paid to J. M. Talbot at the city of Dallas, Texas. And it is further understood that any default on the part of the party of the second part in making any of such payments shall, at the option of the parties of the first part, forfeit this lease and give unto the parties of the first part the right of re-entry upon said land.

"It is agreed, however, that should an overflow of Red river occur during any year of this lease, and the crops growing on said farm be destroyed or materially damaged thereby, then the said Phelps may satisfy the rent specified for that year by gathering and delivering to the said Talbot and Haynie on said farm one-third of all the corn and one-fourth of all the cotton grown and raised on said farm during that year.

"It is further understood between all parties hereto that the parties of the first part are to expend nothing for improvements or repairs upon said land during the period of this lease, and that all repairs or improvements thereon are to be made by the party of the second part at his own cost. And the party of the second part covenants to put the houses on said farm in good tenantable repair and to keep up the said place—that is to say, all the improvements thereon, including the fences—and to deliver the place to the lessors herein at the expiration of this lease with said houses in good tenantable condition and said fences in good repair.

"The party of the second part, in addition to the landlord's lien, which is not waived by the parties of the first part, hereby acknowledges and gives to the parties of the first part an express lien upon all crops of every kind which he may grow or cause to be grown upon said land during the full period of this lease.

"It is, however, further agreed by all parties hereto that, should the parties of the first part make a sale of the land herein leased, then and in that event this lease is to immediately become void.

"In testimony whereof witness our hands in triplicate this the 1st day of December, A. D. 1908. J. M. Talbot.
"M. F. Haynie.
"W. P. Phelps."

The concluding stipulation in this instrument furnishes the grounds of this controversy.

It is conceded by all parties that a sale of the leased premises took place on February 14th, before the lease by its terms expired, that no other contract was entered into between the appellant and the purchasers, and that after the sale the appellant claimed the right to continue to hold under the terms of his written lease and to be liable only for what he had therein agreed to pay—the sum of $350—and which was tendered by him.

The controlling question is: What meaning should be given to the words "should the parties of the first part make a sale of the land herein leased, then and in that event this lease is to immediately become void?" Does this mean that the right of continued occupancy should eo instanti cease when a sale was consummated, and that the purchasers might eject the appellant from the premises in the event he refused to vacate? The appellant contends that under a proper construction of that contract his right of occupancy did not terminate upon the occurrence of a sale; that, having entered upon a year, he had a vested right to hold till the end of that year and to pay only the agreed rental. Chief Justice Willson and the writer now think that contention should be sustained. Our altered views do not result from giving a different meaning to the word "immediately," but from the conclusion that it should be differently applied. The language of this lease might, without altering the meaning which the parties clearly intended to convey, be read as follows:

"It is, however, further agreed by all parties hereto that, should the parties of the first part make a sale of the land herein leased, then and in that event this 'contract' [lease] is to immediately become void."

We have substituted the word "contract" for "lease" because the context clearly shows that it was the lease contract that was to become void.

The next question then is: What are the rights of the parties when the contract is terminated by the happening of the contingency which is provided for? By its terms the contract does immediately cease to be operative; and it can no longer be relied upon as a basis for the acquisition of any future rights. But the termination of the contract under such circumstances cannot destroy rights which had already been acquired. It operates prospectively, and not retrospectively. In other words, the parties to the agreement evidently intended that, when a sale was made, the contract should no longer be considered alive for the purpose of conferring upon either party any further rights which had not then become vested, but which might under its terms be subsequently acquired. To illustrate: Let us assume that the sale, instead of occurring during the last year of the term, had taken place during the first and about the close of that year; the effect would have been to terminate the lease for five years, and Phelps could not thereafter claim a leasehold interest in the premises for any of the succeeding years. Neither could the lessors have claimed an obligation on his part to pay the future rentals contracted for. To say that the contract conveying a leasehold interest extending over a number of years shall be void or at an end upon the happening of a contingency does not necessarily mean that the right of occupancy and use of the premises shall also cease at the same instant. It cannot be said that the parties

have expressly so stipulated; and to hold that they have inferentially done so is purely a matter of construction. There certainly would have been no conflict in the terms of the contract if the parties had added a stipulation providing that in the event a sale should be made during any current year the tenant should have the right to continue in possession till the end of that year and should be responsible for the rents stipulated in the contract. This would merely be making the terms more specific. In contracts of this character, unless there is some stipulation to the contrary justice to all parties would seem to demand that there should be implied what may be called units of tenure; that is, a period of time which must be considered indivisible in determining when the right of occupancy should cease or what amount of rent should be paid. This period may be a day, a week, a month, or a year, depending in every instance upon the subject-matter of the contract, the use to be made of the premises, and the payments of the rent. Here we have as the subject-matter of the contract a farm, which the contract itself shows was to be planted in corn and cotton, well-known annual crops, and which required the use of the land for practically the entire year. The rental is also to be paid annually. Evidently the parties did not contemplate that the tenant should have the use of these premises for only a fractional part of a year; for that might operate to cause the tenant serious damage in the event the landlord should exercise his option to sell at an inopportune moment. Let us suppose that the landlord had made a sale in June or July, after the cultivation of the crops had been completed, but before a harvest; in such an event, if the right of use and occupancy instantly ceased upon the occurrence of the sale, and the tenant might be ousted, he would lose the entire results of his labor. The rule for the construction of contracts is thus stated in Cyc.:

"The words of a contract will be given a reasonable construction when that is possible, rather than an unreasonable one. The court will likewise endeavor to give a construction most equitable to the parties and which will not give one of them an unfair or unreasonable advantage over the other. Thus, where the meaning is doubtful, the construction will be avoided which will entail a forfeiture." 9 Cyc. 587.

· To hold that the parties to this contract meant that the right of possession in the tenant should end with a sale of the premises is to adopt that construction which would give the landlord an inequitable advantage. To illustrate: In this instance the landlord was not required to give the tenant any notice in advance of his intentions to sell; he might without violating his agreement wait quietly till the tenant had expended practically all of the labor and money necessary to mature his crop, and then sell to a purchaser at a price augmented by the value of the tenant's labor and expenditures up to that period. The tenant would lose all, and the landlord would correspondingly gain. Such a construction would give the landlord an unconscionable advantage. It is no answer to say that in this case the sale took place before the crop was planted and cultivated, and that it did not, in fact, operate to the detriment of the tenant. We do not construe contracts by what does actually result, but by what that construction would make possible. If the right of possession could be arbitrarily terminated at any time after the beginning of the current year, before the tenant had expended any labor or money in the preparation for his crop, it might with equal liberty be terminated at any time afterward. There is nothing in the terms of the contract which would confer upon the tenant a right of continued occupancy if the sale is made at one time and not at another. Furthermore, it may be said that such a construction of the contract would operate in the nature of a forfeiture. On one day the tenant might be the owner of valuable crops of corn and cotton worth probably hundreds, or even thousands, of dollars, and without any fault of his own lose it all merely by reason of the fact that the landlord had seen fit to exercise his option to sell.

We have concluded that the proper construction of this contract, and that which the parties intended it should have, is that one year was the least time for which the premises should be enjoyed or paid for; that, when the tenant entered upon the term of one year, his right to a continuation for the remainder of the year became vested. The year was an indivisible unit of tenure, and a termination of the contract did not divest the tenant of the right which he had already acquired under its terms. The parties had the right to make such a contract; they might have made it expressly or by implication. In either event, if they intended to make it, their intentions should be given effect. If the tenant lost the right of possession during a current year, certainly it ought to be held that he was absolved from any obligation to pay rent; yet to so hold we must either say that the lessors intended that he should pay no rent if disturbed before the end of that year, or that he should pay rent in proportion to the time that he occupied the premises. To hold that they intended that he should be entirely absolved from the payment of any rent is to put an equally inequitable construction upon the contract. On the other hand, to say that they intended that he should pay rent apportioned to the time he occupied the premises might require him to pay something for nothing, or even for an actual injury sustained. There is another general rule in construing contracts which shows that the courts are not inclined to permit one party to recover from the other something for noth-

ing. We refer to the rule adopted in refusing to allow recovery of penalties, notwithstanding the parties have stipulated expressly to that effect. There is no reason why the same liberality should not be applied in construing contracts of this character.

The construction which we think should be adopted does no injustice to any of the parties. The tenant gets the benefit of his labor; the landlord, whether it be the original owner or the purchaser, gets what we must assume the parties regarded, when they made the original contract, as a reasonable rental for the premises. The purchaser cannot claim ignorance of what he would be required to take in the event he purchased; he had notice of the contract, and is charged with that construction which the courts in the administration of justice must place upon it.

The substantial facts in this case being undisputed, we conclude the motion for rehearing should be granted, and judgment here rendered in favor of the appellee for the sum of $350, and in favor of the appellant for all costs both of this court and the court below.

LEVY, J. (dissenting). The question is one purely of construction of the lease contract, affecting its discharge or termination. And it is a well-understood principle of construction, in arriving at the intention of the parties, as embodied in the words used by the parties, that all the terms of the agreement must be considered, and force given to each and every word. The parties stipulate that the lease of the premises is to be for the full period or term of five years, beginning January 1, 1909, and ending December 31, 1913, provided a sale of the land is not effected during that five years. The parties say, in clear expression, that:

"Should the parties of the first part make a sale of the land herein leased, then and in that event this lease is to immediately become void."

"Lease" may be defined, and is commonly so understood, as a contract transferring the right to the possession and use of the land for a certain term of years, or at will, in consideration of compensation. Devlin on Real Estate, § 13. "Void" is a word commonly understood to mean "null"; and so the stipulation without qualification that "this lease" shall "become void" indicates the purpose and intent to annul the lease contract in its entirety, both the yielding up of the future possession and use of the land and the obligation of rent. The force of the words admits of no other idea. Therefore, plainly enough, the parties had in mind and affirmatively intended annulling and making of no further force and effect between themselves of the transferred right to the use and possession of the premises, and ceasing of liability for further rental. And annulling the entire lease contract, as the parties definitely say shall be, operates to and for all purposes, in legal effect, the rights of the contracting parties thereunder. The intention of the parties respecting a termination of the lease contract in its entirety on a sale being unequivocally arrived at, then the single fact only remains of whether or not the parties have in their agreement predetermined the precise time for this discharge or termination. If so, and it being within their legal right to contract in that respect as freely as they may choose to do, the courts cannot modify or change the agreement. The phrase "then and in that event" clearly means and has reference only to the time when the sale of the land is effected. Therefore the sale of land is plainly the event intended by the parties to mark the termination of "this lease" earlier than the five years. It is to be regarded as a vital term of the contract, which the parties had the right to agree upon. And the word "immediately" is without qualification by the parties in respect to any different event or period of time, and from its very connection necessarily imports the exclusion of any interval of time. So in the language "then and in that event this lease is to immediately become void" it is difficult to perceive that the parties intended any other interval of time than the precise time when the sale was made. The parties would not, it is reasonable to say, have expressed themselves so definitely and in such explicit terms, in so important a feature of their agreement, if they had not intended to be so understood. Consequently it would appear that the parties definitely say and clearly express their intention that the lease contract in its entirety shall, upon the happening of the sale, instantly become annulled and of no further force and effect between themselves.

If the parties had not predetermined the precise time that the lease contract was to become void after the sale, it might fairly be construed, as done by a majority of the court, as terminating at the end of the calendar year. But the meaning and force of the words "then and in that event * * * immediately" to "become void," as they appear in the sentence, forbids, it is believed, the construction that the lease contract was to be terminated at the end of the current year following the date of sale of the property, which was February 14th. The lessee, viewing it from his standpoint, could have fairly understood that planting a crop might effectuate a loss to him if the place were sold and he had to yield up possession; and yet, so knowing, he nevertheless agreed to yield up possession, and thereby to cut off his claim to have further time. The courts cannot make a new contract for the parties.

It is thought the judgment should be affirmed, and I therefore dissent.